[Cite as *State v. Patterson*, 2023-Ohio-1568.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

                                          No. 111915

    v.                                       :

TRE'VEON PATTERSON,                     :

    Defendant-Appellant.             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 11, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-653557-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Mason McCarthy, Assistant Prosecuting Attorney, *for appellee.*

Russell S. Bensing, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Tre'Veon Patterson ("Patterson") appeals from his convictions and sentence for grand theft, aggravated robbery, and robbery following a jury trial. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} On December 3, 2020, a Cuyahoga County Grand Jury indicted Patterson on Count 1, grand theft in violation of R.C. 2913.02(A)(3); Count 2, theft in violation of R.C. 2913.02(A)(1); Count 3, aggravated robbery in violation of R.C. 2911.01(A)(1); Count 4, robbery in violation of R.C. 2911.02(A)(1); Count 5, robbery in violation of R.C. 2911.02(A)(2); and Count 6, robbery in violation of R.C. 2911.02(A)(3). Counts 3, 4, 5, and 6 each carried one- and three-year firearm specifications. These charges stemmed from an incident that occurred on September 30, 2020.

{¶ 3} Patterson pleaded not guilty to these charges. On June 1, 2022, the case proceeded to a jury trial.

{¶ 4} The state's first witness was the alleged victim, S.B. S.B. testified that she had been talking with Patterson for around five or six months with the intention to date him. According to S.B., she had only met Patterson in person one time before the incident that gave rise to this case. On the date of the incident, Patterson picked up S.B. — she could not remember from where, but thought it might have been from a friend's house — and drove her to his friend D.S.'s house. S.B. testified that D.S. was with another girl at the house, and S.B. and Patterson went into the basement and had sex. Afterwards, S.B. testified that the four of them left D.S.'s house to drop off S.B. and the other girl. When asked where Patterson drove them, the following exchange took place:

STATE: Where did he take you?

S.B.: I can't remember.

STATE: Do you remember a general location?

S.B.: No. I think — I'm not sure. I can't remember. I remember being two places. One was at the house. I can't remember exactly when I was at the house. And the other was at a friend's house in Cleveland, and I kind of feel like it was a place that like people went around the corner where you could go like to have fun and kick it. I also was there, too. I can't remember exactly where I was at and the timeframes.

STATE: Had you been drinking at all that evening?

S.B.: I don't drink.

STATE: Had you engaged in any other substance use?

S.B.: I don't use substances.

STATE: So what happened next?

S.B.: When we were driving I was talking to [D.S.] and he was saying he could do something with a bank account, and I don't know exactly what he was talking about because I don't know anything about that. But I was like okay, you can do it with mine.

STATE: What did he say he could do with your bank account?

S.B.: He didn't explain. He just said he could do something, like get some money from it.

STATE: So he said he could get money in your bank account?

S.B.: Uh-huh.

STATE: Your money or just money from anywhere?

S.B.: I have no idea. I just felt like I could trust it because I knew [Patterson.]

STATE: What happened next?

S.B.: I went to — I gave him the money and the card.

STATE: How much money?

S.B.: I can't remember exactly how much. And he asked me to see my gun. I had a 9 millimeter SCCY purple and black pistol. He asked to see it. I was showing it to him. But after I showed it to him he dropped it, like dropped it in his lap. After he dropped it I realized that something wasn't right. I got out of the car. I was like my stuff's in there, you know, can I get my things? And he just looked up, he looked at [Patterson], and [Patterson] started to drive off, and I was trying to tell him to give me my things, get them to give me my things. And [Patterson] drove over my feet and I fell to the ground.

{¶ 5} S.B. could not remember exactly where this happened, stating only that "it was on a street." She testified that when she got back to the location of her own car, she called and texted Patterson repeatedly to try to get him to give her back her belongings, but "it didn't seem like he was going to give it back especially not like for free." S.B. testified that she then told her mother, C.M., what had happened, and her mother suggested they call the police. Rather than call the police, S.B. arranged to meet Patterson that same day at a Burger King in Garfield Heights, Ohio, to get her firearm and debit card back. S.B. testified that she purchased the gun illegally for $400, and had agreed to pay $800 to get the gun back.

{¶ 6} S.B. and C.M. drove separately to Burger King; C.M. drove with S.B.'s brother. Patterson was in a different vehicle than he had been in previously, and he texted S.B. to let her know that he was in a red truck. S.B. parked on the street, her mother parked in the Burger King parking lot, and S.B. approached the truck. S.B. testified that when she approached the truck, the rear passenger window was down. S.B. testified that Patterson was in the driver's seat, an unknown man was

in the front passenger seat,[1] and D.S. was in the rear passenger seat. S.B. testified that when she approached the vehicle, she saw a gun with an extended clip in D.S.'s window, and D.S. pointed the gun towards S.B.'s mother's car. S.B. testified that the men demanded the $800 she had agreed to bring, and she told them that she would not give them the money until they returned her gun to her. Ultimately, S.B. testified that she walked back towards her car and called her mother to warn her that D.S. had a gun and they needed to drive away. S.B. testified that at that point, her mother drove away, S.B. drove away, and Patterson drove away.

{¶ 7} S.B. testified that on the way home from Burger King, S.B. and her mother saw a police officer up the street from her house and flagged him down to tell him that she had just been robbed. S.B. testified that she went with the officer to Dave's Market, where she identified Patterson and D.S., who had been taken into custody. S.B. explained that a third man was also in custody, but she was unable to identify him. S.B. testified that she wrote a statement and returned home. S.B. testified that she subsequently sought medical attention at Marymount Hospital. S.B. testified that she had sustained a contusion to her right foot and was told that it would heal itself. The state introduced S.B.'s medical records from this visit showing that S.B. had a contusion on her left foot. S.B. testified that several weeks later, Patterson's mother returned S.B.'s gun.

---

[1] This individual was indicted as a codefendant in Patterson's case. The trials were severed and this individual is not a party to or relevant to this appeal.

{¶ 8} In her statement to the police, S.B. said that D.S. was going to put money into her bank account, so she gave him her bank information. At trial, S.B. testified that she did not know exactly what he was going to do, but she believed he was going to "load some money on there and do something," so she gave him money and her debit card.

{¶ 9} The state also called S.B.'s mother, C.M. C.M. testified that S.B. had told her that she had gone out to the club with someone — Patterson — and that when they were ready to leave, they hit her with their car and robbed her of her gun and her money. C.M. testified that "they" kept calling S.B. all day about the situation because they wanted to sell her belongings back to her. C.M. testified that she agreed to go to Burger King in her own car with her son. She parked by the drive-thru entrance. C.M. testified that she parked facing the men's vehicle and saw the young man in the rear passenger seat put his window down, pull a gun up to his window, and then put the gun back down. C.M. testified that S.B. walked around to the driver's side of the vehicle and appeared to be speaking to the driver. C.M. testified that she called S.B. and told her to go back to her car because she was scared. C.M. and S.B. left in their respective cars for their house, which was several blocks from Burger King. C.M. testified that on the way home, there happened to be a police officer on the corner of her street. C.M. pulled over to the police officer, explained the situation to him, and called S.B. to meet her on the corner. C.M. testified that they gave the police a description of the vehicle. She also testified that while they were talking to the police, the men continued to constantly call S.B. and

wanted her to meet them at Dave's Market. At that point, police were dispatched to Dave's Market to look for the vehicle described by C.M. and S.B.

{¶ 10} The state also called Garfield Heights police sergeant Timothy Baon ("Baon") to testify. Baon testified that he was working as a patrolman on the date of this incident. He testified that he had a call from a woman who stated she had been robbed in Cleveland and was meeting the suspects in a Burger King parking lot in Garfield Heights because they were looking to sell her firearm back to her. Baon testified that this transaction did not take place, but he was given a description of the suspects' vehicle, and another officer observed the vehicle stop in the parking lot of a nearby shopping center. Baon testified that he then initiated a stop of that vehicle and removed the three occupants from the vehicle to conduct a pat-down. Baon testified that one of the occupants, D.S., had a loaded firearm in his pants pocket. Baon testified that no other firearms were recovered from the occupants or the vehicle. Baon testified that S.B. was brought to the scene and identified D.S. as the person who had pointed a gun at her.

{¶ 11} Finally, the state called Garfield Heights police detective Richard Fogle ("Fogle") as a witness. Fogle testified that he was assigned this case, and after reviewing the police report, he attempted to follow up with the three individuals who had been taken into custody. Fogle testified that as part of his investigation, he reviewed the evidence, including D.S.'s firearm and cellphones and cash that were recovered from the vehicle. Fogle then contacted S.B., who then shared text messages she had exchanged with Patterson. Fogle testified that he then obtained

security footage from the area around Burger King. Various footage was introduced at trial showing S.B.'s vehicle and the vehicle Patterson and D.S. drove to Burger King in the immediate vicinity of Burger King.

{¶ 12} At the close of the state's case, defense counsel made a Crim.R. 29 motion for acquittal. The court granted this motion as to Counts 5 and 6 and denied the motion as to the remaining counts.

{¶ 13} On June 3, 2022, the parties reviewed the jury instructions with the court, and defense counsel objected to jury instructions as to complicity, aiding and abetting, and constructive possession. The court then instructed the jury, including instructions on complicity, aiding and abetting, and constructive possession over defense objection. Specifically, the court instructed the jury as follows:

> This is a special instruction as to aiding and abetting.
>
> Aiding and abetting. Complicity is sometimes referred to as aiding and abetting. These terms essentially mean the same thing.
>
> Complicity in the commission of the offense charged means the conduct of one who purposely and knowingly participates with another as a partner or accomplice for the purpose of committing such offense.
>
> Such person is regarded as if he were the principal offender, and is as guilty as if he personally performed every act constituting the offense.
>
> This is true even if such a person was not physically present at the time the offense was committed.
>
> When two or more persons have a common purpose to commit an offense or offenses, and one does one part and a second or third person performs another part, those acting together have purpose and knowledge required for the offense charged.
>
> The mere physical presence of a person during the commission of a criminal offense does not in and of itself constitute aiding and abetting,

or, put another way, amount to complicity if that person did not act in furtherance of the criminal offense.

As to constructive possession, constructive possession is also sufficient to prove possession.

Possession may not be inferred from mere access to the thing; however, a person constructively possesses a thing or substance when he knowingly exercises or is able to exercise dominion or control over the thing or substance, or over the premises on which the thing or substance is found or concealed, even though the thing or substance is not in his physical possession.

Knowledge of illegal goods on one's property, for instance, is sufficient to show constructive possession; however, the mere fact the property is located within the premises, under one's control, does not, of itself, constitute constructive possession.

It must also be shown that the person was conscious, that is, aware, of the presence of the object.

Following closing arguments, the jury then began deliberations.

{¶ 14} Later that afternoon, the jury submitted three questions to the court. The first question asked if the concept of aiding and abetting applied to all four counts. Both the assistant prosecuting attorney and defense counsel agreed that the appropriate response to that question was yes. The second question asked:

If we conclude [D.S.] "did have a deadly weapon, to-wit, a handgun, on or about his person or under his control, and either displayed the weapon, brandished it, indicated that he possessed it or used it," must we conclude (if we conclude [Patterson] aided and abetted [D.S.]) that [Patterson] had a deadly weapon, to wit: a handgun, on or about his person or under his control and either displayed the weapon, brandished it, indicated that he possessed it, or used it.

The following discussion then took place between the parties and the court:

STATE: Your Honor, I believe that the first question kind of answers the second one, that the aiding and abetting applies to all the counts, so if they find that the juvenile did have the deadly weapon on him, then

they have to decide whether or not it was [Patterson] aided and abetted with that.

THE COURT:  With all that in mind, do you think with Question One having already been answered as we discussed, do you think the appropriate answer to Question Two is, again, simply the word yes?

STATE:  I believe so, your Honor.

THE COURT:  Does the defense concur?

DEFENSE COUNSEL:  I don't concur, your Honor.  I don't think they have to find that he aided and abetted in this, somebody else possessing a firearm, which is what they seem you want him to tell him.

THE COURT:  The question is worded is if we conclude, et cetera, et cetera, dot dot dot, must we also conclude, dot dot dot, and you believe the answer would be no?

DEFENSE COUNSEL:  The answer would be no.  They're free — they don't have to find anything.  They're free to reach their own conclusions.  I mean, I can certainly have a gun, and an unindicted co-conspirator may not be accessorily liable for my possession of the gun.

THE COURT:  Does not the opening phrase, if we conclude, suggest that the answer to the — must also conclude phrase, would that not necessarily be yes? * * * The way it's phrased, it suggests to me, given the first four words, that the Jury would necessarily reach that conclusion, but I'm certain you'll persuade me otherwise.  It's a complicated question as posed.

DEFENSE COUNSEL:  I think, your Honor, he could, to — the Jury could find that he aided and abetted in the robbery and did not aid and abet in the usage of the firearm.

THE STATE:  Your Honor —

DEFENSE COUNSEL:  Especially considering that's a lesser included at the State's request.

THE COURT:  I see.

THE STATE:  Your Honor, if they find that [D.S.] committed the aggravated robbery and that [Patterson] aided and abetted him, then,

yes, they have to conclude that [Patterson] did so. That's my taking, what they're asking.

DEFENSE COUNSEL: The firearm is a specific enhancement, your Honor. It's an additional finding. They don't have to make that finding. They can find that's aggravated robbery without finding that my client participated in the usage of a gun.

THE STATE: But, your Honor, they're asking if they found that he aided and abetted in the aggravated robbery, then they are finding - - then they do have to find that he participated in the enhancements.

DEFENSE COUNSEL: I disagree respectfully, your Honor.

THE COURT: It strikes me that the opening of Question Two deals more with possession, having a weapon during the crime, and it is factually distinct from aiding and abetting as set forth in question one. It's a fine point, but I don't think they are entirely synonymous.

THE STATE: Your Honor, I believe that what they're referring to is one of the elements of aggravated robbery, not just possession of the firearm.

THE COURT: In context I think that's true.

DEFENSE COUNSEL: If none of us can figure out what the question means, your Honor, I think the safest response is, You have all the jury instructions, and review [them] if you need to.

* * *

THE COURT: It is a long run-on sentence. The question, incredibly enough, is a single sentence, it appears. But I am persuaded by the State that the correct answer is yes, given the apparent parenthetical phrase, if we conclude [Patterson] aided and abetted [D.S.] Accordingly, over the Defense's objection, I will answer this question yes.

{¶ 15} On June 3, 2022, the jury found Patterson guilty of Count 1, grand theft, with respect to S.B.'s firearm; Count 3, aggravated robbery and the attendant firearm specifications; and Count 4, robbery and the attendant firearm specifications. The jury found Patterson not guilty of Count 2, theft, with respect to

S.B.'s debit card. The court referred Patterson to the probation department for a presentence investigation.

{¶ 16} On June 27, 2022, Patterson filed a sentencing memorandum.

{¶ 17} On August 10, 2022, the court held a sentencing hearing. Defense counsel, Patterson's mother, Patterson, the assistant prosecuting attorney, and S.B. addressed the court. The parties agreed that Counts 3 and 4 would merge for sentencing. The court sentenced Patterson to seven years in prison.

{¶ 18} On August 23, 2022, the court held a resentencing hearing. The court sentenced Patterson to 12 months on the grand theft conviction in Count 1 to be run consecutively; three to four and a half years, pursuant to Reagan Tokes, on the aggravated robbery conviction in Count 3; and three years on the firearm specification, for a total sentence of seven to eight and a half years.

{¶ 19} Patterson appeals, presenting three assignments of error for our review:

> I. The trial court erred in entering a conviction that was against the manifest weight of evidence.
>
> II. The trial court erred in instructing the jury that if it found that the principal offender had brandished a firearm while committing an aggravated robbery and found the defendant guilty of complicity in the aggravated robbery, it had to find the defendant guilty of the firearm specifications.
>
> III. The modifications to sentencing for first- and second-degree felonies made by the Reagan Tokes Act violate the defendant's right to jury trial, as protected by the Fifth and Fourteenth Amendment to the United States Constitution, and the separation of powers doctrine embedded in the Ohio Constitution.

**Legal Analysis**

**I. Manifest Weight**

{¶ 20} In Patterson's first assignment of error, he argues that his convictions are against the manifest weight of the evidence. Specifically, he argues that the evidence against him, particularly the testimony from S.B., was riddled with inconsistencies. Patterson argues that S.B.'s testimony regarding the alleged thefts made no logical sense.

{¶ 21} Unlike a challenge to the sufficiency of the evidence, a manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 22} Although we consider credibility when reviewing a manifest weight challenge, "issues relating to the credibility of witnesses and the weight to be given are primarily for the trier of fact." *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 34, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982), and *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Further, the trier of fact is free to believe all, part, or

none of the testimony of each witness. *Id.*, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist.1992). Therefore, appellate courts will generally defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor. *Id.*, citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶ 23} Having reviewed the entire record, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice. S.B.'s testimony was indeed riddled with inconsistencies; she could not remember where she had been the night before the incident, she could not state definitively where she had previously been employed for several months, and she could not remember where Patterson drove her. Likewise, we agree that some of the behavior described in S.B.'s testimony, including her own, was inexplicable. Nevertheless, S.B.'s testimony was consistent as to the elements of grand theft, aggravated robbery, and robbery. Whatever inconsistencies appear in S.B.'s testimony, they are not so significant as to completely undermine her credibility. Further, any judgments as to the prudence of S.B.'s behavior are irrelevant in determining whether the jury clearly lost its way and created a manifest miscarriage of justice.

{¶ 24} Patterson's convictions were not against the manifest weight of the evidence. Therefore, Patterson's first assignment of error is overruled.

## II. Jury Instructions

{¶ 25} In his second assignment of error, Patterson argues that the trial court erred in instructing the jury that if it found that the codefendant was guilty of

the firearm specifications, and found Patterson guilty of complicity, it was required to then find Patterson guilty of firearm specifications. Specifically, Patterson argues that the court's response to the jury's second question during deliberations was incorrect.

{¶ 26} A reversal of a conviction based upon a trial court's response to a question from the jury requires a showing that the trial court abused its discretion. *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995). The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983); *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463.

{¶ 27} Patterson's argument is that in responding affirmatively to the jury's question, the court was essentially instructing the jury that it was required to find Patterson guilty of the three-year firearm specification. Patterson asserts that not only was this instruction legally incorrect, it conflicted with the jury instruction on the permissibility of inconsistent verdicts. Patterson's argument depends on the assumption that the jury's question was referring to the three-year firearm specification, and not to the aggravated robbery offense. With respect to the aggravated robbery charge in Count 3, and the attendant firearm specification, the court instructed the jury as follows:

> As to Count 3, [Patterson] is charged in Count 3 of the indictment with aggravated robbery, in violation of Revised Code 2911.01(A)(1).
>
> Before you can find the defendant guilty of aggravated robbery, you must find beyond a reasonable doubt that on or about the 30th day of

September, 2020, in Cuyahoga County, Ohio, the Defendant did, in attempting or committing a theft offense, or in fleeing immediately after the attempt or offense upon S.B. did have a deadly weapon, to-wit, a handgun, on or about his person, or under his control, and either displayed the weapon, brandished it, indicated that he possessed it or used it.

* * *

As to specifications, if you find the Defendant guilty of aggravated robbery in Count [3], it is your duty to deliberate further and decide upon the specifications.

A specification is an additional finding made by the Grand Jury arising out of the facts of the offenses charged in the indictment.

If you find the Defendant not guilty, of course, you will not consider or decide the additional questions.

The specifications at issue are firearm specifications.

If your verdict is guilty, you will separately decide the State proved beyond a reasonable doubt that the Defendant had a firearm on or about his person, or under his control, or acted with another, who possessed a firearm while committing the offense of aggravated robbery, as charged in Count 3 of the indictment.

* * *

More on firearm specifications.

If your verdict is guilty of aggravated robbery, you will separately decide whether the State proved beyond a reasonable doubt that the Defendant had a firearm on or about his person, or under his control while committing the offense and displayed the firearm, brandished the firearm, indicated possession of the firearm or used the firearm to facilitate the commission of the offense, acted with another, who had a firearm on or about his person, or under his control while committing the offense, and displayed the firearm, brandished the firearm, indicated possession of the firearm and used the firearm to facilitate the commission of the offense.

{¶ 28} The foregoing instruction on aggravated robbery uses the word "weapon," while the foregoing instruction on the firearm specification uses the

word "firearm." The jury question uses the word weapon and goes on to mirror the language of the aggravated robbery instruction. Thus, the jury question appeared to be referring to the aggravated robbery charge, in the context of Patterson's aiding and abetting D.S., rather than to the attendant firearm specification. Therefore, the court's affirmative response to the question was not an incorrect statement of law.

{¶ 29} While it may have provided additional clarity had the trial court responded to the question by reiterating the relevant portion of the jury instructions, or even instructing the jury to do so, the court's decision to instead answer the question affirmatively was not an abuse of discretion. Especially in light of the instructions previously given, nothing about the court's response was unreasonable, arbitrary, or unconscionable. Therefore, Patterson's second assignment of error is overruled.

## III. Reagan Tokes

{¶ 30} In his third assignment of error, Patterson argues that the trial court erred by imposing an indefinite sentence pursuant to Reagan Tokes, enacted under S.B. 201 and R.C. 2901.011. Specifically, Patterson argues that the modifications to sentencing effectuated by Reagan Tokes violate his right to a trial by jury. Patterson's arguments are overruled pursuant to this court's en banc decision in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), which overruled the challenges presented in this appeal to S.B. 201. Therefore, we find that Patterson's sentence pursuant to Reagan Tokes was not a violation of his constitutional rights. Patterson's third assignment of error is overruled.

**{¶ 31}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

FRANK DANIEL CELEBREZZE, III, P.J., and
EILEEN T. GALLAGHER, J., CONCUR


N.B. Judge Mary Eileen Kilbane joined the dissenting opinion by Judge Lisa B. Forbes and the concurring in part and dissenting in part opinion by Judge Anita Laster Mays in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.

Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.