[Cite as *State v. Frazier*, 2026-Ohio-1275.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                   :

    Plaintiff-Appellee,                  :

                                     No. 115203

    v.                                              :

AUGUSTUS G. FRAZIER, IV,                :

    Defendant-Appellant.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 9, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690847-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kerry Sowul and Connor Davin, Assistant Prosecuting Attorneys, *for appellee*.

Jaye M. Schlachet and Eric M. Levy, *for appellant*.

LISA B. FORBES, P.J.:

{¶ 1} Defendant-appellant Augustus G. Frazier, IV ("Frazier") appeals from a judgment of the Cuyahoga County Court of Common pleas convicting him of murder and multiple other offenses. After a thorough review of the law and the facts, we affirm.

## I. Facts and Procedural History

{¶ 2} In April 2024, plaintiff-appellee State of Ohio indicted Frazier on the eight felony counts related to the August 8, 2023 killing of Alexander Eaton ("Eaton"). Those counts were one count of aggravated murder, in violation of R.C. 2903.01(A); two counts of murder, in violation of R.C. 2903.02(A) and 2903.02(B); two counts of felonious assault, in violation of R.C. 2903.11(A)(1) and 2903.11(A)(2); and three counts of having weapons while under disability ("HWWUD"), in violation of R.C. 2923.13(A)(2) and 2923.13(A)(3). The aggravated-murder, murder, and felonious-assault charges each carried one- and three-year firearm specifications.

{¶ 3} Frazier pleaded not guilty to the charges, and the matter proceeded to a jury trial on all charges except two counts of HWWUD, which were tried to the bench. The State called 13 witnesses to testify at trial. These witnesses fell into three general categories: (1) bystanders, law enforcement, and forensic analysts who provided background information on the details of the events leading to Eaton's death and the subsequent murder investigation ("Investigative Witnesses") (2) Tom Ciula ("Ciula"), a video analyst, who testified about video evidence found at the scene of the crime and what it revealed, and (3) Frazier's codefendant, R.F., whose testimony placed Frazier at the scene of the crime and implicated him in Eaton's killing.

## A. Investigative Witnesses

{¶ 4} The first category of witnesses collectively testified to the following undisputed facts. On 10:20 p.m. on August 8, 2023, Eaton was shot while parked in the driveway of a home located at 11920 Minor Avenue, Cleveland, Ohio. After being shot, Eaton attempted to leave the scene in his vehicle but lost control of his car and hit the front porch of a home located at 11928 Minor Avenue. The owner of 11928 Minor Avenue immediately called emergency services to report the crash. On arrival, emergency services found Eaton slumped in the front-driver's seat of his car. Eaton was taken to the hospital where he was pronounced dead.

{¶ 5} An autopsy, conducted by the office of the Cuyahoga County Medical Examiner, revealed that Eaton had sustained three gunshot wounds to his abdomen and that each would have been fatal on its own. The first identified gunshot wound was made by a bullet that entered Eaton's body through the top of his left-side shoulder and continued in a downward trajectory to the right side of Eaton's abdomen, hitting his heart, lung, and liver before coming to rest against Eaton's right-abdominal wall.[1] This bullet, which was recovered from Eaton's abdomen, was assessed to be of medium-sized caliber, consistent with a .40 caliber or a 9 mm caliber bullet — consistent with the two types of shell casings recovered from the scene of the crime. The second identified gunshot wound was made by a bullet that

---

[1] Dr. David Dolinak, who performed the autopsy and testified on behalf of the Cuyahoga County Medical Examiner's Office, explained that the gunshot wounds were labeled Nos. 1–3 based on their anatomical location. The numbering reflects a top-to-bottom order, with gunshot No. 1 located closest to the head.

entered the upper-left side of Eaton's back and traveled downward at an angle through Eaton's left lung, heart, diaphragm, and ribs before exiting Eaton's right-side body. The third gunshot wound came from a bullet that entered through Eaton's left-lower chest and hit his lung, liver, and ribs before exiting Eaton's right-side body. The location of gunshot wounds and the trajectory of the bullets through the body were consistent with a shooter standing next to Eaton's left side and above him.

{¶ 6} Video-surveillance footage obtained from the scene and surrounding area revealed that four vehicles were involved in the shooting: a dark-colored Honda driven by Eaton, a white GMC, a red Ford Taurus, and a light-colored Mercedes with a black hood.

{¶ 7} License-plate registration records identified the white GMC as belonging to Akheem Green ("Green"), who was also the owner of the residence located at 11920 Minor Avenue. Investigators further determined that the temporary-license plate displayed on the Mercedes was registered to Frazier. Additional investigation, including a tip and information from social media, indicated that R.F. — Frazier's codefendant — was associated with the red Ford Taurus.

{¶ 8} A warrant was issued for R.F.'s arrest, and during a custodial interrogation, R.F. informed the investigators that Frazier was the one who shot and killed Eaton while Eaton was seated in the driver's seat of his vehicle in the driveway of 11920 Minor Avenue.

{¶ 9} A search warrant executed on a cell phone found in Frazier's possession contained GPS data placing the cell phone at 11920 Minor Avenue at the exact date and time of the shooting. Additionally, Frazier was observed to have a tattoo on his right hand consistent with one seen on the suspected shooter in surveillance footage recovered from the scene.

{¶ 10} In March 2024 — approximately seven months after the shooting — a search warrant executed at Frazier's residence led to the recovery of a firearm. However, forensic analysis determined that the .40 caliber and 9 mm shell casings recovered from the scene of the crime did not match the firearm found at Frazier's residence.

### B. Video Analyst, Tom Ciula

{¶ 11} At trial the State introduced the testimony of Ciula, an expert in video and audio forensics. Through his testimony, the State introduced several videos and still photographs of the shooting, which had been taken from surveillance cameras located on the porch and side door at 11920 Minor Ave.

{¶ 12} Ciula testified that he became involved in the Eaton murder investigation when the Homicide Division of the Cleveland Police contacted him to retrieve evidence from two digital-video recorders: one retrieved from 11912 Minor Avenue and another from 11920 Minor Avenue. Ciula testified that one of the units, a Sannce digital-video recorder obtained from 11912 Minor Avenue, did not contain a hard drive and, therefore, did not have any video evidence to extract. The other unit, a Zosi HD digital-video recorder obtained from 11920 Minor Avenue, did

contain a hard drive with data to extract. Ciula testified that all the video evidence he extracted came from this single hard drive.

{¶ 13} Ciula testified that with regard to the video extraction, Detective O'Donnell requested a time of download of August 8, 2023, from 9:55 p.m. to 10:45 p.m. Ciula testified that when he downloaded the files from this specific time period, he discovered that there were 82 recorded files, which came from three separate cameras. Ciula explained that he then began the process of "concatenating" these files. As Ciula explained to the jury, the word "concatenate" means stringing the video files together in order to produce one continuing video file. He explained that he did this for all three cameras, resulting in three continuous videos representing the recordings for each of the three different cameras.

{¶ 14} Ciula explained that he reviewed each of these concatenated videos to determine what portions contained the timeframe shortly before, during, and after the shooting. He saved these "select" portions of the recordings, which were approximately eight minutes long, for the detectives to review.

{¶ 15} Ciulla also testified that he also created "stills" from the video recordings, resulting in single-frame pictures of the recording. Additionally, Ciula testified that he made what he referred to as a "tri-file," which was a single recording with camera views of three of the selects showing the timeframe of the shooting. One camera view was a front-on view of the driveway of 11920 Minor Avenue taken from a camera located at the front-porch of the home. Another camera view came from footage from a camera located on the side door of the home facing a lot where

additional cars were parked.  The third camera view came from footage taken from the front porch camera that zoomed in on and followed the individuals at the scene of the crime as they moved in and out of the frame. The tri-file was presented to the jury as State's exhibit No. 504.  Ciula stated that the tri-file was intended to provide viewers with all available video angles of the shooting, including close-up footage and views of the individuals involved.

{¶ 16} The State also introduced exhibit Nos. 502-A and 502-B, consisting of select footage from the front-porch camera and the side-door camera, respectively.  The side-door camera overlooked the lot adjacent to the house where vehicles were parked.  Both videos were presented to the jury in conjunction with Ciula's testimony explaining the footage.

{¶ 17} Together, the videos show that at approximately 10:13 p.m. on August 8, 2023, a red Ford Taurus backed into the lot adjacent to 11920 Minor Avenue.  At that time, a light-colored sedan was parked on the street across from 11920 Minor Avenue.[2]  One minute later, at 10:14 p.m., a white SUV also backed into the adjacent lot, positioning itself directly in front of the Taurus.  Both vehicles then adjusted their positions by backing up further.

{¶ 18} An individual exited the white SUV and approached the person in the Taurus.  Ciula identified this person in the Taurus as Individual No. 2.  At 10:17 p.m., a dark-colored sedan pulled into the driveway of 11920 Minor Avenue, then

---

[2] Previous testimony by investigative witnesses identified the light-colored sedan, described by Ciula, as the Mercedes belonging to Frazier.

immediately backed out and traveled up the street, leaving the view of the camera at 10:18:10 p.m. Approximately 20 seconds later, at 10:18:30 p.m., the same sedan reappeared, traveling in reverse down the street before backing into the driveway of 11920 Minor Avenue. The driver of that vehicle, later identified as the victim, Eaton, was designated by Ciula as Individual No. 1.

{¶ 19} At approximately 10:19 p.m., Eaton exited his vehicle and stood by the open driver's side door as Individual No. 2 approached with a firearm in his hand. At 10:20 p.m., the two appeared to engage in conversation beside the vehicle. At the same time, an individual identified as Individual No. 3 exited the light-colored sedan parked across the street. Individual No. 3 was wearing a face mask and a hoodie. While crossing the street, Individual No. 3 adjusted his mask and cinched the hood pulled over his head. He also reached toward his waistband with his left hand.

{¶ 20} Individual No. 3, while appearing to hold a firearm, approached and positioned himself between Eaton and Individual No. 2. He then engaged in what appeared to be a heated exchange with Eaton, during which Eaton raised his hands and stepped backward. Individual No. 2 also had his firearm drawn in Eaton's direction but moved away toward the rear of the vehicle.

{¶ 21} Eaton then reentered his vehicle. Individual No. 3 was seen reaching into the vehicle and appeared to struggle with Eaton, although a porch column partially obstructed the view. At that point, Individual No. 2 moved toward the driver's-side door as the vehicle began to pull out of the driveway. Individual No. 3

withdrew from the vehicle as it departed. Individual No. 2 then fired six shots at the fleeing vehicle, as indicated by visible muzzle flashes on the video.

{¶ 22} The muzzle flashes occurred at approximately the following times: 10:20:57 p.m., 10:20:58 p.m., 10:20:59 p.m., 10:21:02 p.m., 10:21:03 p.m., and 10:21:04 p.m.

{¶ 23} Eaton's vehicle traveled from the driveway across the street and to the right. Although the collision itself is not captured on video, the vehicle crossed back over the street and struck the porch of 11928 Minor Avenue, located one house away on the same side of the street as 11920 Minor Avenue.

{¶ 24} At approximately 10:21:29 p.m., video footage shows the driver of the white SUV reentering the vehicle along with Individual No. 3 and driving away. Individual No. 2 is then seen entering the Taurus and departing shortly thereafter. The light-colored sedan from which Individual No. 3 had exited also left the scene.

{¶ 25} The State also introduced still photographs derived from the video footage. These images were enlarged to better depict the characteristics of the individuals involved. Still images of Individual No. 3 appeared to show a firearm in his hand during his interaction with Eaton, as well as what appeared to be a tattoo on his left hand.

{¶ 26} Additional still images captured the muzzle flashes, which were consistent with gunfire from Individual No. 2's weapon. Ciula testified, however, that the porch column partially obstructed the view of Individual No. 3's interaction with Eaton inside the vehicle. He further explained that if muzzle flashes had

occurred from Individual No. 3's weapon, they may not have been visible due to that obstruction.

**C. Codefendant R.F.**

{¶ 27} At trial, the State introduced the testimony of R.F. R.F. explained that he agreed to testify against Frazier as part of a plea agreement with the State. Under that agreement, his original charges of aggravated murder, murder, felonious assault, and HWWUD were reduced to involuntary manslaughter and HWWUD. R.F. admitted that reduction in charges resulted in a substantial reduction in sentencing exposure.[3]

{¶ 28} R.F. testified that he had been friends with Eaton since approximately 2010, when they lived in the same neighborhood. Eaton later moved to California in 2022, and although they remained close during that time, their relationship changed after Eaton returned to Ohio a year later. According to R.F., Eaton moved into his home and lived there for approximately three weeks before abruptly leaving. R.F. testified that, while moving out, Eaton stole $1,000 from him. Although R.F. was angry, he stated that he had no way to contact Eaton because Eaton had blocked his phone number.

{¶ 29} R.F. further testified that Eaton was involved with drugs, including marijuana, cocaine, and ecstasy. He stated that, in the three weeks between Eaton's departure from his home and Eaton's death, Eaton shot at him on one occasion. R.F.

---

[3] At the time of his testimony, R.F. had pleaded guilty to the charges of involuntary manslaughter and HWWUD, but had not yet been sentenced.

acknowledged that he did not report the incident to police but instead attempted to follow Eaton, but lost sight of him. R.F. admitted at trial that he remained angry about these events.

{¶ 30} R.F. also testified that he knew Green from growing up in the same neighborhood and that Green was his best friend. He further testified that he knew Frazier from the neighborhood, though they were not close. During his testimony, R.F. identified Frazier in the courtroom.

{¶ 31} Regarding the events of August 8, 2023, R.F. testified that he received a call from Green while at work. Green told him that Eaton had been causing problems at his house, including coming and going uninvited, and asked R.F. to come over because R.F. was better friends with Eaton. R.F. also testified that he, R.F., owed Green $50, which Green wanted him to repay that evening.

{¶ 32} R.F. stated that he arrived at Green's home sometime after 8:00 p.m., driving a red Ford Taurus that he co-owned with a woman named Jacqueline Smith. The State then played exhibit No. 502-A and introduced it again to the jury in conjunction with R.F.'s testimony. While the video was playing, R.F. testified that upon arriving at Green's home, he backed his Taurus into a field next to the house to wait, believing Green would soon pull into the driveway. Instead, Green arrived in a white GMC truck, parked in front of R.F., exited the vehicle, and approached the driver's side of R.F.'s car.

{¶ 33} R.F. testified that he noticed two other vehicles nearby — one on the street and another in a field across the street. He did not know who was in either

vehicle and was not expecting to see anyone else that evening. While he was speaking with Green, a small box-shaped car drove quickly down the street with loud music playing, rounded the corner, and then returned, backing into Green's driveway.

{¶ 34} R.F. exited his vehicle and, together with Green, approached the car in the driveway. R.F. identified himself as the person in the video approaching Eaton's car — the same individual that Ciula had previously identified as Individual No. 2 during his testimony.

{¶ 35} Eaton then exited the vehicle as R.F. approached. R.F. testified that he had a 9 mm gun on his person at the time and that he was holding it during his interaction with Eaton. He stated that he did not see where Green went at that moment but believed he may have moved onto the porch.

{¶ 36} R.F. testified that, while he was speaking with Eaton and questioning him about stealing from others, another person approached from across the street. R.F. identified this individual seen in the video as Frazier — the same individual that Ciula identified as Individual No. 3 in his forensic analysis of the videos. R.F. stated that he knew it was Frazier because he recognized Frazier by his voice. According to R.F., Frazier stood near Eaton's car door and said, "Do you know what this is?" R.F. further testified that he began backing away as the interaction escalated into a heated exchange, during which Eaton stated that he "didn't know what nothing is" and used profane language.

{¶ 37} R.F. testified that Eaton then attempted to reenter his vehicle and leave the driveway. However, Frazier tried to prevent him from leaving and began tussling with Eaton. In the process, R.F. testified that Frazier had ripped a necklace from Eaton's neck. At this point, according to R.F., Frazier drew a firearm, and shot Eaton two to three times while Eaton was seated in the driver's seat of his car. Eaton then pulled out of the driveway.

{¶ 38} R.F. testified that he remained behind the vehicle while Frazier shot Eaton. He further testified that, as Eaton drove away, R.F. fired three or four shots at Eaton's vehicle. R.F. testified that he shot at Eaton because it appeared that Eaton was reaching for something inside the car. Although he did not see Eaton with a gun that day, R.F. testified that Eaton was known to carry one.

{¶ 39} R.F. testified that Eaton pulled out of the driveway, initially drove straight, then veered and struck a house. At that point, R.F. decided to get into his own vehicle and leave the scene. He stated that he observed Frazier run over to and enter Green's white GMC, which then also departed the scene. R.F. testified that he returned to his own home afterward.

{¶ 40} R.F. further testified that approximately two weeks later, homicide detectives arrived at his home, detained him, and transported him to the police station for questioning. R.F. admitted that during his initial interview, he was not forthcoming about his knowledge of the events. He denied any involvement in Eaton's death and denied being present at the scene.

{¶ 41} When detectives later presented him with still images from surveillance footage taken from cameras at the scene, R.F. acknowledged that he was present but claimed he did not have a firearm, instead stating that he was holding a "stick." R.F. also acknowledged that he had come to the house at Green's request, both because he owed Green money and because Green was having trouble with Eaton riding by and entering his home unannounced.

{¶ 42} R.F. admitted that he initially withheld Frazier's identity from the detectives because he "didn't want to seem like a snitch." Specifically, when shown images depicting himself and a masked individual, R.F. told detectives he did not recognize the person because the individual wore a face mask and had his hoodie up. R.F. testified that he told the detectives that he only saw the masked individual's eyes and that the individual had tattoos on his hands.

{¶ 43} At trial, however, R.F. admitted that the masked individual was Frazier. He testified that he had known Frazier since the age of eight and recognized him by his voice, despite the mask and hood. R.F. further testified that he later informed detectives that the individual was, in fact, Frazier.

{¶ 44} R.F. also testified that, during the period between when Eaton lived with him and Eaton's death, Eaton had been arrested and detained at the Lake County Jail. During his initial interview, detectives presented R.F. with a social-media post dated July 26, 2023, regarding Eaton's arrest. In that post, R.F. had commented, "B**** so lucky the police got him first." On cross-examination, R.F. acknowledged that he made the post about Eaton. He further admitted that, during

his initial interview with detectives, he was willing to implicate his best friend, Green, but did not identify Frazier — someone he acknowledged he was less close with — as the masked individual. On redirect, R.F. explained this discrepancy by stating that Green had not shot Eaton, whereas Frazier had, making it easier for him to disclose Green's involvement to investigators.

### D. The Remainder of Trial

{¶ 45} Frazier did not call any witnesses in his defense, and the trial court proceeded to instruct the jury on the charges. Specifically, the jury was instructed on the elements of murder as if Frazier was the principal offender and was also instructed to consider the charge of murder under a theory of complicity, specifically aiding and abetting. During jury deliberations, the jury asked the following question of the court: "Can we use the picture in the video (the still) . . . which is in evidence to compare the alleged of the tattoos over his right eyebrow to what we observed in court to identify Augustus Foster?"[4] The trial court answered, "Yes."

{¶ 46} The jury returned a verdict finding Frazier not guilty of Count 1, aggravated murder, guilty of Count 2 — murder, in violation of R.C. 2903.02(A), with both accompanying firearm specifications, guilty of Count 3 — murder, in violation of R.C. 2903.02(B), with both accompanying firearm specifications; guilty of Count 4 — felonious assault, in violation of R.C. § 2903.11(A)(1), with the

---

[4] Before answering the question, the trial court had the bailiff inquire whether the jury had meant to say "Augustus Foster." The foreman responded by explaining that he intended to write "Augustus Frazier" on the question but mistakenly wrote the wrong name.

accompanying firearm specifications, and guilty of Count 5 — felonious assault, in violation of R.C. § 2903.11(A)(2), with the accompanying firearm specifications. With regard to the murder charge, the jury returned a general verdict of guilty. No interrogatories were requested by the parties to determine whether the guilty verdict resulted from a consensus that Frazier was guilty as the principal offender in the crime or as an aider and abettor.

{¶ 47} The trial court additionally found Frazier guilty of the two counts of HWWUD.

{¶ 48} On May 6, 2025, Frazier was sentenced to life in prison with parole eligibility after 21 years. Frazier appeals from his conviction, raising the following five assignments of error:

> I. Appellant's convictions for murder and having weapons while under disability were not supported by sufficient evidence in violation of the due process clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.
>
> II. Appellant's convictions for murder and having weapons while under disability were against were against the manifest weight of the evidence.
>
> III. The trial court erred by providing a prejudicial response to a jury question.
>
> IV. The trial court abused its discretion by instructing the jury on complicity.
>
> V. Appellant was deprived [of] his Sixth Amendment right to effective assistance of trial counsel.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 49} In his first assignment of error, Frazier argues that his convictions for murder in violation of R.C. 2903.02(A) and HWWUD in violation of R.C. 2923.13(A)(2) and (A)(3), must be vacated because they are not supported by sufficient evidence. We find no merit to this assignment of error.

{¶ 50} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict as a matter of law. *See State v. Parker*, 2022-Ohio-1237, ¶ 7 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). On review, appellate courts examine the evidence in the light most favorable to the State and conclude whether any rational trier of fact could have found that the State proved all of the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386. "In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Mosley*, 2015-Ohio-1390, ¶ 7 (10th Dist.).

{¶ 51} Murder, under R.C. 2903.02(A), states that "no person shall purposefully cause the death of another." Thus, in order for there to be sufficient evidence of murder under R.C. 2903.02(A), the State had to present evidence going

to the following three elements: Frazier (1) purposely, (2) caused the death, (3) of Eaton.

{¶ 52} At trial, R.F. testified that Frazier stood by the driver's side of Eaton's vehicle and used a gun to shoot Eaton, who was seated in the driver's seat of his car while parked in the driveway at 11920 Minor Ave. The coroner who examined Eaton's body following his death testified that the trajectory of the gunshot wounds that killed Eaton were consistent with the shooter standing at the driver's side of the vehicle. When taken together, this evidence — eyewitness testimony that Frazier shot Eaton while standing next to Eaton who was seated in the driver's seat and corroborating forensic testimony that the fatal shots were consistent with a person standing in that location — is sufficient to sustain a conviction for murder under R.C. 2903.02(A).

{¶ 53} HWWUD, in violation of R.C. 2923.13(A)(2), states in relevant part that "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if" the person "has been convicted of any felony offense of violence." R.C. 2923.13(A)(3) states in relevant part that "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if" the person "has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse."

{¶ 54} Both of Frazier's HWWUD charges were tried to the bench following his conviction for murder, and Frazier stipulated that he had a prior felony conviction for attempted felonious assault, a felony offense of violence, and for the

felony offense of drug trafficking, another felony offense of violence. Accordingly, the only element of the HWWUD charges that required additional evidence from the State was evidence that Frazier had a weapon in his possession. As noted above, R.F.'s testimony satisfied this element.

{¶ 55} Thus, we find that the State presented sufficient evidence to sustain Frazier's conviction for murder in violation of R.C. 2903.02(A) and his convictions for HWWUD in violation of R.C. 2923.13(A)(2) and (A)(3). Frazier's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 56} In his second assignment of error, Frazier contends that his convictions for murder in violation of R.C. 2903.02(A) and HWWUD in violation of R.C. 2923.13(A)(2) and (A)(3), are against the manifest weight of the evidence and should, therefore, be vacated. We disagree.

{¶ 57} Unlike a sufficiency challenge, which tests the burden of production of evidence, a manifest-weight-of-the-evidence challenge tests the burden of persuasion. *See Thompkins*, 78 Ohio St.3d at 386. In other words, a manifest-weight challenge "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, "[the] court looks at the entire record and ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in

resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.”’” *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 58} At trial, the jury is in the “best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony.” *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). Reversal on manifest-weight grounds is, therefore, reserved for the “‘exceptional case in which the evidence weighs heavily against the conviction.’” *Thompkins* at 387, quoting *Martin* at 175.

{¶ 59} Frazier argues that his murder conviction is against the manifest weight of the evidence because there was a lack of physical evidence linking him to the crime and the only testimony linking him to the crime came from R.F., who admitted to lying to investigators about his involvement in the crime and testified only in exchange for a favorable plea deal. We disagree with Frazier’s characterization of the evidence against him and hold that the jury did not clearly lose its way in finding him guilty of murder.

{¶ 60} To begin, there was physical evidence connecting Frazier to Eaton’s murder. Specifically, Frazier’s car was identified at the crime scene, and surveillance video showed an individual who was later identified as one of the shooters, exiting this vehicle and approaching Eaton’s car just moments before the shooting.

{¶ 61} In addition, digital evidence in the form of GPS data from a cell phone used by Frazier placed him at 11920 Minor Avenue at the exact date and time of the murder. Investigators also noted that Frazier had a tattoo on his right hand that matched the tattoo seen on the suspect shooter in the surveillance-video footage recovered from 11920 Minor Avenue. Finally, two distinct types of shell casings were recovered at the scene, indicating that two different guns had been fired. R.F. admitted to firing one of these guns, a 9 mm, from behind Eaton's vehicle as he drove away. The only other individual in a position to have caused the gunshot wounds was the person seen in the surveillance-video footage immediately to Eaton's left — a person who had exited Frazier's car just moments before the shooting, and a person that R.F. identified as Frazier to investigators.

{¶ 62} Although it is true that R.F.'s testimony provided the only direct evidence of Frazier's involvement in the murder, as opposed to the circumstantial evidence described above, it is important to note that "circumstantial evidence carries the same weight as direct evidence."[5] *Gaines*, 2003-Ohio-6855, at ¶ 55.

{¶ 63} While there are reasons to question the credibility of R.F.'s testimony given his involvement in the crime, his initial dishonesty with investigators, and his incentive to testify against Frazier in exchange for a favorable plea deal, we do not find his testimony so incredible as to warrant overturning the jury's verdict. A manifest-weight-of-the-evidence analysis considers the overall weight of *all* of the

---

[5] This court has described "circumstantial evidence" as "proof of certain facts or circumstances in a given case, from which the trier of fact may infer other connected facts that would reasonably follow." *State v. Gaines*, 2003-Ohio-6855, ¶ 55 (8th Dist.).

evidence, *see Brown*, 2025-Ohio-2804. at ¶ 30, and, as noted above, there is substantial circumstantial evidence implicating Frazier as the shooter. Moreover, the State effectively rehabilitated R.F.'s testimony during redirect examination. When asked why he had not initially been forthcoming in identifying Frazier as the shooter, despite being willing to implicate his best friend Green, R.F. explained that he did not want to be seen as a "snitch" and that, unlike Frazier, Green had not fired a weapon that night.

{¶ 64} Accordingly, we find that the jury did not clearly lose its way in finding Frazier guilty of murder in violation of R.C. 2903.02(A).

{¶ 65} Likewise, it cannot be said that the trial court clearly lost its way in convicting Frazier of the two counts of HWWUD when Frazier stipulated to the underlying convictions that put him in a position of not being permitted to own or possess firearms, and the weight of the evidence supported the jury's guilty verdict on the murder charge that included the fact that a gun had been used in the commission of the murder.

{¶ 66} We, therefore, overrule Frazier's second assignment of error.

## C. Response to Jury Question

{¶ 67} In his third assignment of error, Frazier asserts that the trial court abused its discretion by responding "yes," over defense counsel's objection, to the jury's question about whether it was permitted to compare Frazier's in-court appearance — specifically tattoos the jury had observed over Frazier's right eyebrow-— to a still photo of the alleged suspect shooter at the crime scene. At trial, defense

counsel argued, as part of his objection, that the court should simply respond to the jury that it "has in [its] possession all of the evidence [it] will receive in this case for deliberations."

{¶ 68} Frazier argues on appeal that by giving an unqualified "yes" to the jury's question it allowed the jury to consider evidence of Frazier's identity that had not been introduced at trial and that this violated his right to have the State prove his identity and his guilt beyond a reasonable doubt. Specifically, Frazier argued that "no evidentiary foundation had been laid to establish that Frazier's appearance in court (specifically, his tattoos) was the same as his appearance on August 8, 2023."

{¶ 69} "A reversal of a conviction based upon a trial court's response to a question from the jury requires a showing that the trial court abused its discretion." *State v. Patterson*, 2023-Ohio-1568, ¶ 26 (8th Dist.), citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995). "An abuse of discretion 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *W.A.F.P., Inc. v. Sky Fuel Inc.*, 2024-Ohio-3297, ¶ 13 (8th Dist.), quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A court commits an abuse of discretion by "exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 70} We find no abuse of discretion in the trial court's decision to permit the jury to compare Frazier's in-court appearance with the still photograph of the suspect admitted at trial. The Ohio Supreme Court has recognized that a

defendant's face and body constitute physical evidence. *See State v. Brown*, 38 Ohio St.3d 305, 317 (1988). At trial, R.F., an eyewitness to the shooting, identified Frazier in open court as the person who shot and killed Eaton.

{¶ 71} Although the State did not specifically highlight any connection between Frazier's eyebrow tattoo and the suspect depicted in the still images, the jury was entitled to make its own comparison. Such a comparison is no different from that permitted in any case where photographic evidence of a suspect is introduced and the State alleges that the defendant present in court is that individual.

{¶ 72} Moreover, the possibility that Frazier acquired the facial tattoo after Eaton's death but before his arrest was a matter the jury could reasonably consider. The trial court's response to the jury's question did not preclude the jury from weighing that fact as part of its deliberations.

{¶ 73} Accordingly, we find no abuse of discretion and overrule Frazier's third assignment of error.

### D. Complicity Instruction

{¶ 74} In his fourth assignment of error, Frazier argues that the trial court abused its discretion in instructing the jury on complicity/aiding and abetting, over defense counsel's objection. Frazier argues that there was no evidence presented that showed he acted in concert with R.F. or another person to commit the offense. We disagree.

{¶ 75} "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 2015-Ohio-3954, ¶ 240, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). A trial, the court has discretion to determine whether a given jury instruction is warranted, and an appellate court will not reverse the decision of the trial court absent and abuse of discretion. *See State v. Belton*, 2024-Ohio-2357, ¶ 77 (8th Dist.). As noted above, an abuse of discretion implies that a court exercised its discretionary authority in an unreasonably, arbitrary or unconscionable way. *See Blakemore* 5 Ohio St.3d at 219; *see also Johnson*, 2021-Ohio-3304, at ¶ 35.

{¶ 76} R.C. 2923.03(A) governs complicity and provides in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). "[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245-246 (2001). "Aiding and abetting may be shown by both direct and circumstantial evidence and participation may be inferred from presence, companionship, and conduct before and after the offense is committed." *State v. Berry*, 2024-Ohio-923, ¶ 33 (5th Dist.), citing *State*

*v. Paskins*, 2022-Ohio-4024, ¶ 27 (5th Dist.), citing *State v. Cartellone*, 3 Ohio App.3d 145, 150 (8th Dist. 1981). "If the facts at trial reasonably supported the jury instruction on aiding and abetting, it is proper for the trial judge to give that charge." *Berry* at ¶ 36.

{¶ 77} In this case, the record contains sufficient facts to support the trial court's instruction on aiding and abetting. The evidence presented at trial permitted the jury to find that Frazier was present at the scene of the crime and was the hooded, masked individual who exited the Mercedes that had been parked on the street when Eaton arrived at 11920 Minor Avenue. The evidence further supported a finding that Frazier was armed while speaking with Eaton in the driveway and that he engaged in a physical struggle with Eaton in an apparent attempt to prevent him from leaving.

{¶ 78} Additional evidence supported the inference that Frazier possessed a firearm and used it, since two different types of shell casings were recovered from the scene, and other than R.F., the masked and hooded individual was the only other person in a position to fire the fatal shots. Finally, the evidence showed that Frazier fled immediately after the shooting, along with the other individuals present at the scene.

{¶ 79} Taken together, this evidence was enough to reasonably support the jury instruction on aiding and abetting because the evidence was sufficient to support a jury finding that, regardless of whether Frazier fired the fatal shots — that is, whether he was the principal offender — he was complicit in the offense as an

aider and abettor. In other words, the jury could reasonably conclude from the evidence that Frazier encouraged, cooperated with, or incited the principal offender in the commission of the crime. *See Johnson* 93 Ohio St.3d, at 245-246. Accordingly, the jury instruction was proper and Frazier's fourth assignment of error is overruled.

### E. Ineffective Assistance of Counsel

{¶ 80} In his fifth assignment of error, Frazier asserts that his counsel was ineffective at trial and that this ineffectiveness prejudiced the outcome of his case. Specifically, Frazier argues that his counsel failed to adequately cross-examine R.F. and another detective during their testimony, failed to object to alleged prosecutorial misconduct, and failed in closing argument to effectively articulate why the jury should not find that the elements of aiding and abetting had been met. We disagree that trial counsel was ineffective and overrule Frazier's assignment of error.

{¶ 81} The Sixth Amendment of the U.S. Constitution and Ohio Const. art. I, § 10 provide that defendants in all criminal proceedings shall have the right to counsel. The United States Supreme Court has recognized that "'the right to counsel is the right to effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984), quoting *McMann v. Richardson*, 397 U.S. 759, 771, fn. 14 (1970). To succeed on a claim of ineffective assistance of counsel, a defendant must prove: (1) that counsel was deficient in some aspect of their representation, and (2) that there is a reasonable probability that, but for counsel's deficiency, the result of trial

would have been different. *Id.* at 687. When reviewing a claim of ineffective assistance of counsel, appellate courts are to give deference to counsel's performance. *See State v. Williams*, 2018-Ohio-4612, ¶ 67 (8th Dist.), citing *Strickland* at 689. "'A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Id.*, quoting *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.). Accordingly, "'[t]rial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel.'" *Id.*, quoting *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.).

{¶ 82} None of Frazier's arguments overcome the presumption that counsel rendered effective assistance of counsel. To begin, "the scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Johnson*, 2015-Ohio-3248, ¶ 102 (10th Dist.). Accordingly, Frazier's argument that counsel did not adequately cross-examine R.F. because "[c]ounsel failed to effectively impeach R.F. with his numerous, detailed, and video recorded lies to police during his initial interrogation," does not amount to ineffective assistance of counsel.[6] The same is true of counsel's alleged deficiencies in their cross-examination of one of the detectives who had investigated the case.

---

[6] We, nevertheless, note that defense counsel did cross-examine R.F. on his initial dishonesty with the detectives and did use video evidence to, at times, impeach R.F.'s testimony.

{¶ 83} Moving on to Frazier's argument that counsel was ineffective for failing to object to prosecutorial misconduct during the State's closing, Frazier argues here that the prosecutor improperly bolstered R.F.'s testimony by giving the jury his personal opinion that R.F. was a credible witness. An examination of the transcript however shows that the prosecution did nothing of the sort. Rather, what the prosecution did at closing was point out that one of the State's witnesses, who had interviewed R.F. about the murder, had found R.F. to be credible. Furthermore, the prosecution pointed out that the reason R.F. may not have been initially forthcoming about Frazier's involvement was because he was scared to come forward. In support of this position, the prosecution pointed to testimony given by R.F. that he had been informed while in jail that Frazier did not want him to testify and that he knew where R.F.'s mother lives. Accordingly, we find that contrary to Frazier's argument, the prosecution did not improperly bolster R.F.'s testimony with counsel's own opinion but rather took the evidence presented at trial and suggested that the jury draw inferences from that evidence — actions that are wholly permissible. *See State v. Sankey*, 2006-Ohio-5316, ¶ 34 (5th Dist.) ("It is proper for the prosecution to comment on the evidence in closing argument and to state the appropriate conclusions to be drawn there from.").

{¶ 84} Lastly, defense counsel was not ineffective for failing to object to the aiding-and-abetting jury instruction. As noted above, this instruction was properly given by the court because the evidence presented at trial supported the instruction.

{¶ 85} Accordingly, Frazier's fifth assignment of error is overruled.

## III. Conclusion

{¶ 86} For the foregoing reasons, we overrule Frazier's five assignments of error and affirm his convictions and sentence.

{¶ 87} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
ANITA LASTER MAYS, J., CONCUR